UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CHARLES NAPOLEON,** | **CIVIL ACTION NO.** |
| **Plaintiff** | **SECTION:** |
| vs | **JUDGE** |
| **SHOWS, CALI & WALSH, LLP** a Louisiana limited liability partnership; **MARY CATHERINE CALI,** an individual; and **JOHN C WALSH,** an individual. | **MAGISTRATE JUDGE** |
| | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

_____

## COMPLAINT -- CLASS ACTION

NOW INTO COURT, Plaintiff, CHARLES NAPOLEON (hereinafter referred to as "PLAINTIFF") by and through undersigned counsel, alleges upon knowledge as to himself and his own acts, and upon information and belief as to all other matters, and brings this complaint against the above-named DEFENDANTS and in support thereof alleges the following:

## PRELIMINARY STATEMENT

1.  PLAINTIFF brings this action on his own behalf and on the behalf of all others similarly situated for statutory damages arising from SHOWS, CALI & WALSH, LLP; MARY CATHERINE CALI, and JOHN C WALSH's (collectively hereinafter referred to as "DEFENDANTS") violations of the Fair Debt Collection Practices Act (hereinafter referred to as the "FDCPA"), 15 U.S.C. § 1692, *et seq*.

1

## JURISDICTION AND VENUE

2. The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.

3. Venue is proper pursuant to 28 U.S.C. § 1391(b) because PLAINTIFF and DEFENDANTS reside and/or do business in the Eastern District of Louisiana. Venue is also proper in this District because the acts and transactions that give rise to this action occurred, in substantial part, in the Eastern District of Louisiana.

## PARTIES

4. PLAINTIFF is a natural persons residing in New Orleans, Louisiana.

5. PLAINTIFF is a "consumer" as defined in the FDCPA at 15 U.S.C. § 1692a(3).

6. PLAINTIFF allegedly owes a (past due) consumer debt as defined by 15 U.S.C. § 1692a(5).

7. SHOWS, CALI & WALSH, LLP (hereinafter referred to as "SCW") is a Louisiana limited liability partnership which regularly collects or attempts to collect debts owed or due or asserted to be owed or due another.

8. MARY CATHERINE CALI (hereinafter referred to as "MCC") is a Partner with SCW who regularly collects or attempts to collect debts owed or due or asserted to be owed or due another.

9. JOHN C. WALSH (hereinafter referred to as "JCW") is a Partner with SCW who regularly collects or attempts to collect debts owed or due or asserted to be owed or due another.

10. PLAINTIFF is informed and believes, and thereon alleges, that DEFENDANTS regularly collect or attempt to collect consumer debts owed or due or asserted to be owed or due another and that each DEFENDANT is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

## STATEMENT OF FACTS

11. PLAINTIFF repeats, re-alleges, and incorporates all above paragraphs as though fully set forth herein.

12. In 2005, the State of Louisiana was slammed by two major hurricanes that devastated the Gulf Coast. Hurricane Katrina made landfall on August 29, 2005; Hurricane Rita made landfall on September 24, 2005 (collectively "the 2005 Hurricanes").

13. The devastation created an unprecedented housing crisis.

14. In response, Congress appropriated billions of dollars in disaster relief through the U.S. Department of Housing and Urban Development's (HUD) Community Development Block Grant (CDBG) program to affected areas in five states, including Louisiana.

15. HUD's authority to make CDBG funds available to states, tribes and local governments arises from the Housing and Community Development Act of 1974 (HCDA), 42 U.S.C. §5301 *et seq*.

16. The "HCDA vests in local administrators…the power to allocate federal fiscal resources for the purpose of achieving congressionally established goals." *Dixson v. U.S.,* 465 U.S. 482, 500 (1984).

17. "By accepting the responsibility for distributing these federal fiscal resources, [local administrators] assume[] the quintessentially official role of administering a social service program established by the United States Congress." *Dixson v. U.S.* at 497

18. The day-to-day administration of the federal program, including the actual expenditure of federal funds, is delegated to state and local authorities. *Dixson v. U.S.* at 486.

19. To receive HCDA funds, recipient state and local authorities must go through an application and approval process.

20. HUD audits administration of the federal funds and may take corrective actions ranging from issuing a warning letter to instituting collections procedures to recover improperly expended funds. 42 U.S.C. §5311(a); 24 C.F.R. §570.496(b), (d).

21. In early 2006, Louisiana submitted its application for CDBG funds. On or about May 12, 2006, Louisiana submitted Amendment 1 to its original action plan, known as the Road Home Program.

22. The Road Home Program was administered by the Louisiana Office of Community Development (OCD) and the Louisiana Recovery Authority.

23. PLAINTIFF'S home, like many others, suffered significant damage caused by the 2005 Hurricanes.

24. On April 24, 2007, PLAINTIFF entered into a contract with the OCD to obtain a HUD Road Home grant. A copy of the Agreement is attached hereto as **Exhibit 1**.

25. PLAINTIFF received $48,496.70 in grant proceeds to elevate his home.

26. Thereafter, PLAINTIFF obtained bids to elevate his home and discovered that the cost to elevate the home far exceeded the grant award.

27. PLAINTIFF instead used the money to make other necessary repairs to the home.

28. Pursuant to Road Home's request, PLAINTIFF provided all invoices, receipts and repair bids as evidence the money was used to repair the home.

29. On August 24, 2015, HUD issued a news release entitled "HUD PROVIDES CLARITY FOR LOUISIANA'S ROAD HOME ELEVATION INCENTIVE PROGRAM".

30. The release states in pertinent part:

> Following the Inspector General's report, the State of Louisiana estimated that approximately 16,000 households who received elevation incentive payments did not elevate their homes. The majority of these households were lower income or senior citizens who did not have sufficient resources to either rehabilitate their homes or to elevate them, and many appear to have chosen to apply their elevation grants toward the repairs to their properties or interim living expenses while rebuilding.
>
> To overcome this design flaw and to address the concerns expressed by the Office of the Inspector General, HUD is now requiring the State to perform on-site inspections to verify how noncompliant households actually spent their elevation grants. If the State can determine that these households used the funds to repair their properties or to sustain themselves in rental housing, HUD will consider these households compliant with the overarching policy goals of long-term recovery, and they will not have to repay their elevation grants.

A true and correct copy of the HUD news release is attached hereto as **Exhibit 2**.

31. On December 28, 2015, Road Home sent PLAINTIFF a letter notifying him that he would be compliant with the elevation grant program if he used the money to make repairs to his house. The letter stated in pertinent part:

> If you used your elevation incentive funds to finish the repairs to your home:
>
> a. Provide proof of payment documentation (i.e. contracts, receipts, canceled checks, or bank statements) on all of the repair or reconstruction work done on your home; or
>
> b. The **Field Inspection** is a new method to review the costs of repairs or reconstruction of homes. Field Inspections could lower or eliminate the amount of elevation funds owed back to the program. All you have to do is make an appointment with a Road home filed inspector team and allow them to survey your home by completing an estimated cost of value. Inspectors will look at things you identify as completed such as foundation work, wall framing, roofing, plumbing, electrical, flooring, etc. If this inspection reveals that the work performed on your home exceeds the total resources received (Road Home grant, including the elevation funding, insurance and FEMA payments) you will no longer

5

>be required to repay your grant funds as you would then be in compliance with the program. This may cover a portion or all of your current amount subject to repayment.

A true and correct copy of the December 28, 2015 letter is attached hereto as **Exhibit 3**.

32. On January 5, 2018, over 10 years from receipt of the grant, DEFENDANTS sent, or caused to be sent, the collection letter, attached hereto as **Exhibit 4**, to collect $30,000.

33. DEFENDANTS write in pertinent part:

Our office represents the Office of Community Development-Disaster Recovery Unit ("Road Home") in connection with certain Road Home Elevation Incentive ("RHEI") funds which you received as described above. Our client's records indicate that you have failed to establish compliance with your RHEI obligations. Those compliance obligations are outlined in your RHEI Agreement.

       *          *         *

If you used your RHEI funds to *finish the repairs to your home*:

- Provide proof of payment documentation (i.e. contracts, receipts, canceled checks, or bank statements) on all of the repair or reconstruction work done on your home.

\* In addition, there are other ways for you to establish compliance. A flyer is enclosed to advise you of other options available to you. *Please read it fully as you may be able to reduce your obligation to repay the RHEI funds.*

34. In response to DEFENDANTS' collection letter, PLAINTIFF called DEFENDANTS and advised that the money was used to repair the house.

35. DEFENDANTS requested the invoices and other proof of repair but PLAINTIFF had already mailed the originals to Road Home and did not retain copies for himself.

36. Instead, PLAINTIFF requested DEFENDANTS send a contractor to the home to evaluate the repairs.

37. DEFENDANTS responded that they were no longer sending out contractors.

38. Upon information and belief, DEFENDANTS were/are still sending contractors to review repairs necessary to establish compliance with the Road Home Elevation Grant.

39. On July 1, 2019, without having conducted an on-site inspection, DEFENDANTS sued PLAINTIFF in Orleans Parish Civil District Court in a case entitled *State of Louisiana, Division of Administration, Office of Community Development – Disaster Recovery Unit vs. Charles Matthew Napoleon and Mary Ann Napoleon A/K/A Marry Daggs*, Case No. 2019-6927. A true and correct copy of the collection lawsuit is attached hereto as **Exhibit 5** for the Court's convenience.

40. DEFENDANTS' allege PLAINTIFF failed to use the money to elevate his house and therefore is entitled to recover the elevation grant on behalf of the State of Louisiana Division of Administration Office of Community Development. *Id*.

41. DEFENDANTS then moved for summary judgment.

42. PLAINTIFF, unable to repay the Elevation Grant, filed for bankruptcy protection on January 23, 2020, in the Eastern District of Louisiana, Case No. 20-10175.

43. At all times relevant herein, PLAINTIFFS complied with the terms of the Agreement and, thus, no money is owed.

44. However, even if PLAINTIFF had violated the terms of the Agreement, he did so more than 6 years ago and thus, the DEFENDANTS claims are time-barred under the Federal 6 year statute of limitation.

45. PLAINTIFF is informed and believes and therefore alleges that PLAINTIFF and the class members are entitled to statutory damages and may have also suffered damages in other ways and to other extents not presently known to PLAINTIFF, and not specified herein. PLAINTIFF reserves the right to assert additional facts and damages not referenced herein, and/or to present evidence of the same at the time of trial.

## CLASS ALLEGATIONS

46. PLAINTIFF repeats, re-alleges, and incorporates all above paragraphs as though fully set forth herein.

47. These claims for relief are brought by PLAINTIFF individually and on behalf of the following class:

    a. A class of consumers, who:
    b. Had executed an agreement with the OCD to receive the Road Home Elevation Grant;
    c. Used the Elevation Grant to repair the home; and
    d. Within one year prior to the filing of this action were sued by DEFENDANTS after DEFENDANTS failed to perform an on-site inspection to determine if the grant was used to repair the home.

48. PLAINTIFF does not know the exact size or identities of the class as DEFENDANTS maintain exclusive control of such information. Because of the widespread use and reliance on Road Home grants following the 2005 Hurricanes, PLAINTIFF believes the class includes more than 100 individuals. The identities of these individuals can be readily determined from DEFENDANTS' business records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

49. All class members have been affected by the same conduct. The common questions of law and fact predominate over any questions affecting only individual members of the class. These questions include, but are not limited to:

    a. Whether DEFENDANTS' actions violate 15 U.S.C. §§ 1692e2(a), (5), (10), and f;

      b. The identities of individuals who were sued by DEFENDANTS after DEFENDANTS failed to perform an on-site inspection which violated the above subsections; and

      c. The total number of consumers who were sued by DEFENDANTS after DEFENDANTS failed to perform an on-site inspection which violated the above subsections.

50. PLAINTIFF's claims are typical of the claims of the classes and do not conflict with the interests of any other class members. PLAINTIFF and the members of the classes were uniformly subjected to the same conduct.

51. PLAINTIFF will fairly and adequately represent the class members' interests and has retained counsel who are qualified to pursue this litigation. PLAINTIFF's counsel's firm, GESUND & PAILET, LLC, focuses on prosecuting FDCPA lawsuits. PLAINTIFF's counsel, Keren E. Gesund, also has extensive experience in prosecuting FDCPA class actions.

52. PLAINTIFF is committed to vigorously pursuing the claims herein.

53. A class action regarding the issues in this case does not create any problems of manageability.

54. A class action is superior for the fair and efficient adjudication of the class members' claims as Congress specifically envisioned class actions as a principal means of enforcing the FDCPA. *See* 15 U.S.C.§ 1692k. The members of the class are generally unsophisticated consumers, whose rights will not be vindicated in the absence of a class action. Prosecution of separate actions by individual members of the classes would also create the risk of inconsistent or varying adjudications resulting in the establishment of inconsistent or varying standards and would not be in the best interest of judicial economy.

55. If facts are discovered to be appropriate, PLAINTIFF will seek to certify the class under Rule 23(b) of the Federal Rules of Civil Procedure.

## FIRST CLAIM FOR RELIEF

**VIOLATIONS OF THE FDCPA 15 U.S.C. §§ 1692e(2)(A), (5), (10) and §1692f AGAINST DEFENDANTS BROUGHT BY PLAINTIFF INDIVIDUALLY AND ON BEHALF OF THE CLASS**

56. PLAINTIFF repeats, re-alleges, and incorporates all above paragraphs as though fully set forth herein.

57. A debt collector is prohibited from misrepresenting the "character, amount, or legal status of any debt." 15 U.S.C. §1692e(2)(A).

58. A debt collector is also prohibited from threatening "to take any action that cannot legally be taken" or using any false or "deceptive means to collect or attempt to collect" a debt. 15 U.S.C. §§ 1692e(5) and (10).

59. Finally, a debt collector is prohibited from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f(1).

60. On or before August 24, 2015, HUD decided that use of the elevation grant to repair a hurricane damaged home is "compliant with the overarching policy goals of long-term recovery, and [Louisiana residents] will not have to repay their elevation grants."

61. On August 24, 2015 HUD issued a news release entitled "HUD PROVIDES CLARITY FOR LOUISIANA'S ROAD HOME ELEVATION INCENTIVE PROGRAM".

62. The press release states in pertinent part:

> Following the Inspector General's report, the State of Louisiana estimated that approximately 16,000 households who received elevation incentive payments did not elevate their homes. The majority of these households were lower income or senior citizens who did not have sufficient resources to either rehabilitate their homes or to elevate them, and many appear to have chosen to

apply their elevation grants toward the repairs to their properties or interim living expenses while rebuilding.

To overcome this design flaw and to address the concerns expressed by the Office of the Inspector General, HUD is now requiring the State to perform on-site inspections to verify how noncompliant households actually spent their elevation grants. If the State can determine that these households used the funds to repair their properties or to sustain themselves in rental housing, HUD will consider these households compliant with the overarching policy goals of long-term recovery, and they will not have to repay their elevation grants.

*See* Exhibit 2.

63. HUD "now require[es] the State to perform on-site inspections to verify how noncompliant households actually spent their elevation grants." *Id*.

64. In the instant matter, PLAINTIFF notified DEFENDANTS that he had used the Elevation Grant to repair his home.

65. He also notified DEFENDANTS that he no longer had proof of the repairs because he previously sent all documents to Road Home.

66. PLAINTIFF then requested DEFENDANTS send a contractor to the house to evaluate the cost of repairs.

67. DEFENDANTS refused.

68. On July 1, 2019, without having conducted an on-site inspection, DEFENDANTS sued PLAINTIFF in Orleans Parish Civil District Court in a case entitled *State of Louisiana, Division of Administration, Office of Community Development – Disaster Recovery Unit vs. Charles Matthew Napoleon and Mary Ann Napoleon A/K/A Marry Daggs*, Case No. 2019-6927. *See* Exhibit 5.

69. DEFENDANTS' allege PLAINTIFF failed to use the money to elevate his house and therefore is entitled to recover the elevation grant on behalf of the State of Louisiana Division of Administration Office of Community Development. *Id*.

70. As a result of DEFENDANTS' FDCPA violations, Plaintiff is entitled to an award of statutory damages.

71. It has been necessary for PLAINTIFF to obtain the services of an attorney to pursue this claim and PLAINTIFF is entitled to recover reasonable attorneys' fees therefor.

72. It has been necessary for PLAINTIFF, on behalf of herself and those similarly situated to obtain the services of an attorney to pursue this claim and are entitled to recovery reasonable attorneys' fees therefor.

## SECOND CLAIM FOR RELIEF

**VIOLATIONS OF THE FDCPA 15 U.S.C. §§ 1692e(2)(A), (5), (10) and §1692f AGAINST DEFENDANTS BROUGHT BY PLAINTIFF INDIVIDUALLY**

73. PLAINTIFF repeats, re-alleges, and incorporates all above paragraphs as though fully set forth herein.

74. A debt collector is prohibited from misrepresenting the "character, amount, or legal status of any debt." 15 U.S.C. §1692e(2)(A).

75. A debt collector is also prohibited from threatening "to take any action that cannot legally be taken" or using any false or "deceptive means to collect or attempt to collect" a debt. 15 U.S.C. §§ 1692e(5) and (10).

76. Finally, a debt collector is prohibited from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f(1).

77. The Road Home program is a federally sponsored program.

78. The OCD was delegated the day-to-day administration of the program to assist Louisiana homeowner's damaged by Hurricanes Katrina and Rita.

12

79. By accepting responsibility for distributing these federal fiscal resources, the OCD assumed "the quintessentially official role of administering a social service program established by the United States Congress." *Dixson v. U.S.* at 497.

80. An action for money damages for breach of a government contract is subject to a six-year statute of limitation. *See* 28 USC §2415(a); *see also FDIC v. Bledsoe,* 989 F. 2d 805 (5th Cir. 1993) (holding that a private third party, collecting on a defaulted federal debt, was still subject to §2415).

81. Similarly, "an action to recover for diversion of money paid under a grant program…may be brought within six years after the right of action accrues." *See* 28 USCS §2415(b).

82. Nevertheless, on July 1, 2019, almost 12 years after PLAINTIFF executed the April 24, 2007 grant agreement, DEFENDANTS sued PLAINTIFF for breach of the Elevation Grant Agreement.

83. PLAINTIFF, unable to repay the Elevation Grant, filed for bankruptcy protection on January 23, 2020, in the Eastern District of Louisiana, Case No. 20-10175

84. DEFENDANTS misrepresent the status of the alleged debt, by implying that they could still pursue a claim for breach of contract.

85. As a result of DEFENDANTS' FDCPA violations, Plaintiff is entitled to an award of statutory and actual damages.

86. It has been necessary for PLAINTIFF to obtain the services of an attorney to pursue this claim and PLAINTIFF is entitled to recover reasonable attorneys' fees therefor.

## **THIRD CLAIM FOR RELIEF**

### **VIOLATIONS OF THE FDCPA 15 U.S.C. §§1692e(2)(A), (10) and §1692f AGAINST DEFENDANTS BROUGHT BY PLAINTIFF INDIVIDUALLY**

87. PLAINTIFF repeats, re-alleges, and incorporates all above paragraphs as though fully set forth herein.

88. A debt collector is prohibited from misrepresenting the "character, amount, or legal status of any debt." 15 U.S.C. §1692e(2)(A).

89. A debt collector is also prohibited from using any false or "deceptive means to collect or attempt to collect" a debt. 15 U.S.C. § 1692e(10).

90. Finally, a debt collector is prohibited from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f(1).

91. On January 5, 2018, DEFENDANTS sent, or caused to be sent, the collection letter, attached hereto as **Exhibit 4**, to collect $30,000.

92. DEFENDANTS write in pertinent part:

Our office represent the Office of Community Development-Disaster Recovery Unit ("Road Home") in connection with certain Road Home Elevation Incentive ("RHEI") funds which you received as described above. Our client's records indicate that you have failed to establish compliance with your RHEI obligations. Those compliance obligations are outlined in your RHEI Agreement.

        \*        \*        \*

If you used your RHEI funds to *finish the repairs to your home*:

- Provide proof of payment documentation (i.e. contracts, receipts, canceled checks, or bank statements) on all of the repair or reconstruction work done on your home.

\* In addition, there are other ways for you to establish compliance. A flyer is enclosed to advise you of other options available to you. *Please read it fully as you may be able to reduce your obligation to repay the RHEI funds.*

93. In response to DEFENDANTS' collection letter, PLAINTIFF called DEFENDANTS and advised that the money was used to repair the house.

94. No longer in possession of proof of repair, PLAINTIFF requested DEFENDANTS send a contractor to the home to evaluate the repairs.

95. DEFENDANTS misrepresented that they were no longer sending out contractors.

96. Upon information and belief, DEFENDANTS are and continue to send contractors to review repairs to establish compliance with the Road Home Elevation Grant.

97. PLAINTIFF, unable to repay the Elevation Grant, filed for bankruptcy protection on January 23, 2020, in the Eastern District of Louisiana, Case No. 20-10175.

## DEMAND FOR JURY TRIAL

98. Please take notice that PLAINTIFF demands trial by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF respectfully prays that this Court grant the following relief in PLAINTIFF'S favor, and on behalf of the class, and that judgment be entered against DEFENDANTS for the following:

(1) To certify PLAINTIFF'S claims as a class action pursuant FRCP 23(b);

(2) To Designate PLAINTIFF as the class representative and designate undersigned counsel as class counsel;

(3) To issue notice to the prosed class at DEFENDANTS' expense;

(4) To enter judgment that the practices complained of herein are unlawful under the FDCPA and that DEFENDANTS violated the rights of PLAINTIFF and the class under the FDCPA;

(5) For actual damages incurred by PLAINTIFF pursuant to 15 U.S.C. § 1692k(a)(1);

(6) For statutory damages awarded to PLAINTIFF, not to exceed $1000, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

(7) For statutory damages awarded to the Class Members, pursuant to 15 U.S.C. § 1692k(a)(2)(B), of the amount not to exceed the lesser of $500,000 or 1 per centum (1%) of the net worth of the DEFENDANTS;

(8) For reasonable attorneys' fees for all services performed by counsel in connection with the prosecution of these claims;

(9) For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

(10) For any and all other relief this Court may deem appropriate.

DATED this 21st day of June 2020.

**GESUND AND PAILET, LLC**

*/s/ Keren E. Gesund, Esq.*
Keren E. Gesund, Esq.
Louisiana Bar No. 34397
3421 N. Causeway Blvd., Suite 805
Metairie, LA  70002
Tel: (504) 836-2888
Fax: (504) 265-9492
keren@gp-nola.com
Attorney for Plaintiff