```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
```

**CHARLES NAPOLEON**                                    **CIVIL ACTION**

**VERSUS**                                              **NO. 20-1775**

**SHOWS, CALI & WALSH,**                                **SECTION "B"(4)**
**LLP, ET AL.**

## ORDER AND REASONS

Before the Court is plaintiff Charles Napoleon's motion for certification of interlocutory appeal and stay pending interlocutory appeal (Rec. Doc. 44).

For the reasons discussed below,

**IT IS ORDERED** that the motion for certification of interlocutory appeal and stay pending interlocutory appeal (Rec. Doc. 44) is **DENIED**.

**I. FACTS AND PROCEDURAL HISTORY**

This suit arises from a dispute over funds provided to Charles Napoleon following Hurricanes Katrina and Rita in 2005. Hurricane Katrina made landfall in Louisiana and Mississippi on August 29, 2005, and was quickly followed by Hurricane Rita on September 24, 2005. Rec. Doc. 25 at 7. The resulting devastation was unprecedented, leading Congress to appropriate "disaster recovery funds to the State of Louisiana, through HUD's Community Development Block Grant ("CDBG") Program." *Id.* at 7-8. HUD directed Louisiana to submit an Action Plan for Disaster Recovery, and

1

through this Action Plan the State "created the Road Home Program to compensate affected Louisiana homeowners for their losses." *Id.* at 8-9. CDBG grants funded the Road Home Program and the Louisiana Recovery Authority (LRA) operated it. *Id.* at 9, 9 n.10. The LRA is a "state agency created [by Executive order] to administer funds for recovery from Hurricanes Katrina and Rita, including CDBG Disaster Recovery Grant Funds." *Id.*

HUD maintained that they would "monitor the State's use of funds *and* its actions for consistency with the Action Plan." Rec. Doc. 31 at 4 (emphasis in original). Also, HUD would "instate risk analysis and on-site monitoring of grantee management of the grants and of the specific use of funds." *Id.* HUD's responsibility extended to "ensuring Louisiana's interpretation of the statutory and regulatory requirements were 'not plainly inconsistent with the [Housing and Community Development Act of 1974].'" Rec. Doc. 25 at 10 (alteration added) (quoting 24 C.F.R. § 570.480(c)). HUD's other responsibilities included: providing technical assistance, "advice, training, or program models to ensure the State of Louisiana complied with CDBG program requirements . . . ." *Id.* The State of Louisiana remained responsible for "the implementation, design, and administration of the Road Home Program in conformance with the applicable CDBG Program requirements set by HUD." *Id.* at 11 (internal quotations omitted) (quoting Rec. Doc. 25-2 at 69).

Whereas the Road Home Program disbursed four types of grants, only two are involved in this matter: the compensation grant and the elevation grant. *See* Rec. Doc. 31 at 5. The compensation grant was given to homeowners to repair property damage on their homes. *Id.* Napoleon executed the compensation grant agreement on April 24, 2007, and received a check for $48,496.70 but "returned the check to the title company," thinking it was to purchase his house.[1] *Id.* at 7.

The elevation grant was "given to eligible homeowners who agreed to elevate their homes within three years." *Id.* at 5. The elevation grant totaled $30,000.00 and to receive the grant, the homeowner had to execute the Road Home Program Elevation Incentive Agreement For Use With Prior Road Home Grant. *See id.;* Rec. Doc. 25 at 11-12. Napoleon entered into the agreement on July 23, 2008. Rec. Doc. 25-2 at 51. The agreement provided:

> Within three years of the date of this Elevation Incentive Agreement, the elevation (height) of the home on the above Property will be at or above the Advisory Base Flood Elevation (ABFE's) published by FEMA . . . I understand that to comply with this paragraph I must elevate my home to be at or above the elevation required by this Agreement even if the authority having jurisdiction of building code enforcement is not requiring elevation of the home . . . If the home on the property does not meet or exceed the applicable ABFE's or BFE's by three years from the date of the Elevation Incentive Agreement, the entire amount of my Elevation Incentive must be repaid to the State of Louisiana . . . . This Agreement shall be enforceable, at law or in equity, by the State of Louisiana or the

---

[1] Defendants dispute plaintiff's accounting of whether he received or returned his compensation grant. *See* Rec. Doc. 61 at 1-2; Rec. Doc. 47 at 1-3.

> United States of America. I agree that [the Office of Community Development ("OCD")] shall be entitled to recover reasonable attorney's fees and other costs, in the event OCD institutes legal action against me for enforcement of this Agreement.

*Id.* at 50. "When Mr. Napoleon received the elevation grant, he used that money to repair his home." Rec. Doc. 31 at 7-8. Napoleon obtained a Certificate of Occupancy and Completion on October 12, 2011, which stated that he made repairs and renovated his home after the storms. *Id.* at 8. Napoleon did not keep copies of the original receipts or proof of repair. *Id.*

On July 26, 2013, HUD approved Action Plan Amendment No. 60 which stated:

> The cost to elevate homes has increased substantially since the Road Home program began disbursing Elevation Incentive (RHEI) awards to homeowners. In addition, many homeowners did not have adequate funds to complete the basic repairs needed to re-inhabit their homes at the pre-existing elevation. As a result, applicants receiving RHEI funds may have found it necessary to use those funds to complete their repair/reconstruction at the existing elevation. Since the primary goal of the Road Home Program is to enable applicants to return and reoccupy their homes, this Action Plan Amendment (APA 60) identifies how the use of RHEI funds will be considered in cases where applicants have used some or all of those funds to repair and re-occupy their homes. The purpose of APA 60 is to enable RHEI award amounts that have been used for home repair and reconstruction to be more accurately re-classified as part of the applicant's compensation award.

Rec. Doc. 31-12 at 2. This re-classification applied to "[o]nly Road Home applicants that have received an RHEI award and have not

4

yet met the compliance terms associated with the award agreement . . . ." *Id.* The Amendment further stated that:

> If an eligible applicant . . . has used a portion or all of his or her RHEI funds for valid home repairs, then the respective amount used for home repairs will be added to the applicant's compensation award. Their RHEI award amount will be reduced accordingly. Homeowners must provide documentation that can demonstrate the use of the RHEI funds on valid home repairs.

*Id.* Two years later on December 28, 2015, the OCD sent Napoleon a letter stating that he could keep the elevation grant funds "[i]f you used your elevation incentive funds to finish the repairs to your home." Rec. Doc. 31 at 9, 51 (alteration in original) (internal quotations omitted).

On January 5, 2018, Mary Catherine Cali and John C. Walsh of Shows, Cali & Walsh, LLP mailed Napoleon a letter which stated that Napoleon "failed to establish compliance with [his] RHEI obligations." Rec. Doc. 25-2 at 53. The letter requested documents establishing that (1) the home was elevated; (2) the funds were used to elevate the home, but elevation was never completed; or (3) the funds were used to finish repairs to the home. *See id.* The letter also stated that:

> You have 30 days after your receipt of this letter to notify our office that you dispute the validity of this [RHEI], or any portion thereof. Failure to timely do so will result in an assumption by our office that the full amount of the RHEI repayment claim is valid.

*Id.* at 54. The letter further included that "if you do not take any of the actions outlined above, within ninety days after your

5

receipt of this letter, Road Home may proceed with further action against you, including legal action, in connection with the amount of RHEI funds owed as outlined above." *Id.* At this point, Napoleon did not submit any additional documentation. Rec. Doc. 31 at 9. On February 12, 2018, Ashley Napoleon, plaintiff's current wife, called defendants saying Napoleon previously submitted documentation on how he used the elevation grant, but defendants could find no such documentation in their records. Rec. Doc. 31-13 at 2; Rec. Doc. 46-1 at 5. Then between June and July of 2019, Napoleon submitted additional photographs to show that he, as the applicant, shored his home. *See* Rec. Doc. 46-1 at 5; Rec. Doc. 46-11 at 1. Defendants, however, could not observe an increase in elevation. Rec. Doc. 31-13 at 1.

On July 1, 2019, Shows, Cali, & Walsh, LLP filed suit in the Orleans Civil District Court on behalf of the State of Louisiana, Division of Administration, Office of Community Development — Disaster Recovery Unit, naming Charles and Mary Ann Napoleon as defendants. Rec. Doc. 31 at 10; *see State of La., Div. of Admin., Off. of Cmty. Dev. — Disaster Recovery Unit v. Napoleon*, 2019-6927 (Orleans Parish Civ. Dist. Ct. 2019). In that suit, the State alleged Napoleon must return his $30,000.00 elevation grant. Rec. Doc. 31 at 10; *see* Rec. Doc. 31-4. On September 3, 2019, Napoleon answered, making no affirmative defenses. Rec. Doc. 25 at 13; Rec. Doc. 31 at 10. The State then moved for Summary Judgment, but on

6

January 23, 2020, before the motion could be heard, Napoleon filed a voluntary Chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Louisiana (Case No. 20-10175). Rec. Doc. 31 at 10-11.

Napoleon next filed this suit against the law firm representing the Road Home Program on June 21, 2020, which defendants answered on October 30, 2020. Rec. Docs. 1, 11. The complaint was then amended on February 1, 2021. Rec. Doc. 19. In the amended complaint, plaintiff makes two claims for relief. Plaintiff's first claim is that under 15 U.S.C. §§ 1692e(2)(A), e(5), e(10), and f, defendants were prohibited from collecting the grant money from the plaintiff, because it was not owed to the State, as plaintiff used the funds within the acceptable parameters of the grant. *See* Rec. Doc. 19 at 11-13. Plaintiff also brought their second claim under 15 U.S.C. §§ 1692e(2)(A), e(5), e(10), and f, and contends that even if the money was owed to the State, defendants were time-barred from collection under the six-year federal statute of limitations, 28 U.S.C. § 2415(a-b), or in the alternative the five-year liberative prescription period for actions on negotiable and nonnegotiable instruments under Louisiana Civil Code Article 3498. *Id.* at 13-15.[2] On July 16, 2016,

---

[2] While plaintiff states in the Amended Complaint that the Louisiana Civil Code Article 3498 applies if state law applies, in plaintiff's response to defendants' motion to dismiss, he argues that if state law applies, the five-year liberative prescription periods of Article 1564 or Louisiana Revised

7

defendants submitted a motion to dismiss for lack of standing/subject matter jurisdiction and for failure to state a claim. Rec. Doc. 35. Then on August 12, 2021, plaintiff filed a motion for class certification under Federal Rule of Civil Procedure 23. Rec. Doc. 28.

The Court denied defendants' motion to dismiss on plaintiff's first claim, but granted it on his second one. *See* Rec. Doc. 42. The Court found that even if plaintiff did owe the State money, collecting that debt was not time barred because the Louisiana ten-year prescriptive period under Louisiana Civil Code Article 3499 applies, not the six-year statute of limitations under § 2415(a-b) or the five-year peremptive period under Louisiana Civil Code 1564 or Louisiana Revised Statute 9:2771. *Id.* at 11-20. Accordingly, the Court also denied plaintiff's motion for class certification because plaintiff's class allegations rested on the claim that defendants' actions were barred by a six-year or five-year statute of limitations. *See* Rec. Doc. 43. Plaintiff subsequently submitted the instant motion for certification of interlocutory appeal and a stay pending appeal. Rec. Doc. 44.[3]

---

Statute 9:2772 apply, not the liberative prescription period of Article 3498. *Compare* Rec. Doc. 19, *with* Rec. Doc. 31.
[3] Cross motions on summary judgment are also currently pending before the Court. *See* Rec. Docs. 45, 46.

## II. LAW AND ANALYSIS

### A. 28 U.S.C. § 1292(b) Standard

Interlocutory appeals pursuant to 28 U.S.C. § 1292(b) are appropriate only in exceptional cases. *Fairfield Royalty Co. v. Island Operating Co., Inc.*, No. 10-3446, 2011 WL 6140665, at *2 (E.D. La. Dec. 9, 2011) (quoting *United States v. Garner*, 749 F.2d 281, 286 (5th Cir. 1985)). District courts may certify an interlocutory appeal from an order when they are "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Nguyen v. Am. Com. Lines L.L.C.*, 805 F.3d 134, 137-38 (5th Cir. 2015) (quoting 28 U.S.C. § 1292(b)). "A district court cannot certify an order for interlocutory appeal unless all three criteria are present." *La. State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Louisiana*, 495 F. Supp. 3d 400, 410 (M.D. La. 2020). Additionally, in deciding to certify an order for interlocutory appeal, the court must articulate why the order satisfies each of these criteria. *See Linton v. Shell Oil Co.*, 563 F.3d 556, 568 (5th Cir. 2009). The decision to permit an appeal under § 1292(b) "is firmly within the district court's discretion." *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 722 (N.D. Tex. 2006) (citing *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 405 n.9 (2004) (Ginsburg, J., dissenting)).

**B. Interlocutory Appeal**

**1. Controlling Question of Law**

A controlling issue of law has some impact on the course of the litigation. *Ryan*, 444 F. Supp. 2d at 723. "[A]n issue is not seen as controlling if its resolution on appeal would have little or no effect on subsequent proceedings." *Tesco Corp. v. Weatherford Int'l, Inc.*, 722 F. Supp. 2d 755, 766 (S.D. Tex. 2010). "If reversal of an order terminates the action, it is clearly a controlling question of law." *La. State Conf.*, 495 F. Supp. 3d at 413. Nevertheless, "the resolution on appeal does not necessarily need to terminate the action altogether to be considered a controlling question of law." *Id.*

In its prior Order, the Court ruled that the ten-year prescription period under Louisiana Civil Code Article 3499 applies to defendants' debt collection activities. Rec. Doc. 42 at 11-20. Plaintiff insists that either the six-year federal statute of limitations period, the five-year peremptive period under Louisiana Revised Statutes 9:2772, or the five-year prescriptive period under Louisiana Civil Code Article 1564 applies instead, and thus, defendants' attempts to collect plaintiff's debt are time barred. *See id.*; *see also* Rec. Doc. 44-1 at 6-7. The reversal of the Court's decision to apply the ten-year prescription period would not terminate plaintiff's action; rather, it would give plaintiff an alternative cause of action.

10

However, a reversal would have a significant impact on subsequent proceedings in the case. Plaintiff's class allegations rest exclusively on the assertion that a five- or six-year prescription period applies to plaintiff's debt. *See* Rec. Doc. 19 at 8-10; *see also* Rec. Doc. 44-1 at 4-5. When the Court ruled that a ten-year prescription period applies, plaintiff's class allegations were then also dismissed. *See* Rec. Doc. 43. As reversal affects whether plaintiff could proceed with his class claims, then a controlling question of law is present here. *See Odle v. Wal-Mart Stores, Inc.*, No. 3:11-cv-2954-O, 2013 WL 66035, at *2 (N.D. Tex. Jan. 7, 2013) (finding that the district court's ruling dismissing the class claims as time-barred because tolling did not apply was a controlling question of law); *Castano v. Am. Tobacco Co.*, 162 F.R.D. 112, 115-16 (E.D. La. 1995) (finding that whether a class should be certified is a controlling issue of law because it "affect[s] thousands, if not millions, of cases that could proceed against the defendants in this case"); *Jenkins v. Raymark Indus., Inc.*, 109 F.R.D. 269, 287 (E.D. Tex. 1985) (suggesting that an order of class certification is a controlling question of law because it "affect[s] disposition of 893 claims comprising the class").

### 2. Substantial Ground for Difference of Opinion

The threshold for establishing the second factor for certifying an order for interlocutory appeal "is a high one." *La.*

*State Conf.*, 495 F. Supp. 3d at 414. Disagreement with a court's order is not enough to establish that there is substantial ground for a difference of opinion. *Fairfield Royalty*, 2011 WL 6140665, at *2 (citing *Clark-Dietz & Assocs.-Eng'rs., Inc. v. Basic Constr. Co.*, 702 F.2d 67, 68 (5th Cir. 1983)). Courts have found substantial ground for difference of opinion where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

*Ryan*, 444 F. Supp. 2d at 723-24 (quoting 4 Am. Jur. 2d Appellate Review § 128 (2005)). "A substantial ground for difference of opinion usually arises out of a genuine doubt as to the correct applicable legal standard relied on in the order." *La. State Conf.*, 495 F. Supp. 3d at 414.

In determining whether the six-year federal statute of limitations or a state law prescriptive period applies, a court must first decide whether the OCD is an agency of the United States. *See* 28 U.S.C. § 2415(a) ("[E]very action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years."). In his original opposition, plaintiff relied on a Supreme Court decision, *Dixson v. United States*, to argue that the OCD is a

12

federal agency, and thus, the federal six-year statute of limitations applies to defendants' actions. *See* Rec. Doc. 31 at 15 (citing 465 U.S. 482 (1984)); *see also* Rec. Doc. 44-1 at 5-6.[4] Defendants, on the other hand, relied on *United States v. Orleans* to argue that the OCD does not meet the definition of a federal agency, and consequently, only a state peremptive period applies. *See* Rec. Doc. 25 at 21 (citing 425 U.S. 807 (1976)); *see also* Rec. Doc. 44-1 at 5-6. *Dixson* centered on whether employees working at a community-based social-service organization administrating federal block grant funds were public officials under the federal bribery statute, 18 U.S.C. § 201(a). *Orleans* concerned whether a community action agency that received all of its monetary resources from the Office of Economic Opportunity, a federal agency, was an agency under the Federal Tort Claims Act, 28 U.S.C. § 2671.

Thus far, it does not appear that either one of these cases have been applied to whether an entity is an agency of the United States under § 2415—although, *Orleans* has been applied to other

---

[4] In a proposed motion for consideration, plaintiff notes that "two Louisiana state court of appeal decisions in cases brought by the State through OCD against homeowners for breach of the elevation incentive agreement," applied "the ten-year prescriptive period of Article 3499." Rec. Doc. 214-1 at 15. However, plaintiff claims that "[b]ecause the courts simply accepted the parties' stipulation that art. 3499 applied and did not consider whether a more specific, shorter federal statute of limitations or Louisiana prescriptive period might apply, their rulings cannot inform this Court's decision." *Id.* Additionally, in plaintiff's proposed motion for consideration, he cites cases where courts applied the six-year statute of limitation under § 2415 where "an assignee stands in the shoes of the federal government." *Id.* at 34. Nevertheless, it is not yet clear that OCD and defendants are assignees of federal debt, thus, application of these cases may be misplaced.

13

legislative acts. *See Adams v. State Farm Fire & Cas. Co.*, No. CIV. A. 96-1571, 1996 WL 592734, at *2 (E.D. La. Oct. 10, 1996) (applying *Orleans* to the Equal Access to Justice Act); *White v. N. La. Legal Assistance Corp.*, 468 F. Supp. 1347, 1351 (W.D. La. 1979) (applying *Orleans* to the Legal Services Act); *see also* Rec. Doc. 44-1 at 5. The LRA and the OCD are state agencies taxed with the administration of the road home grants funded by HUD's Community Development Block Grant ("CDBG") Program, like in *Dixson*. On the other hand, although *Orleans* addressed what constitutes a "federal agency" in the context of the Federal Tort Claims Act, it has been used to define federal agencies in the context of other federal statutes.

While Louisiana courts have not yet addressed which prescriptive period applies to recovering a Road Home debt, the Court finds there is no substantial ground for difference of opinion.[5] *See* Rec. Doc. 44-1 at 6; *Ausama v. Tetra Applied Tech.*, No. 05-2513, 2006 WL 8456267, at *3 (E.D. La. July 10, 2006) (finding no substantial ground for difference of opinion because "the parties do not dispute the law to be applied, merely how it is applied here.").

---

[5] *See supra* note 4.

3. **Materially Advancing the Ultimate Termination of the Litigation**

Section 1292(b) "does not require the appeal to *certainly* advance the termination of the litigation. It only requires such appeal *may* advance the ultimate termination of the litigation if permitted." *La. State Conf.*, 495 F. Supp. 3d at 416 (emphasis added). "An immediate appeal materially advances the termination of litigation if it would eliminate the need for trial, simplify the issues for trial, or reduce the burden of discovery." *David v. Signal Int'l, LLC*, 37 F. Supp. 3d 836, 839 (E.D. La. 2014). Indeed, "[a] key concern consistently underlying § 1292(b) decisions is whether permitting an interlocutory appeal will speed up litigation." *Tesco*, 722 F. Supp. 2d at 767. Avoidance of a post-trial appeal can be sufficient to satisfy the third prong of § 1292. *La. State Conf.*, 495 F. Supp. 3d at 416 (citing *Cazorla v. Koch Foods of Miss.*, 838 F.3d 540, 548 (5th Cir. 2016)).

Here, the Court finds that an interlocutory appeal would not materially advance the termination of litigation. The instant matter is scheduled for trial in two weeks. If the Fifth Circuit were to reverse this Court's dismissal of the claim underlying plaintiff's class allegations, then the ultimate termination of litigation would not be advanced, but instead substantially delayed. There is no reason that an interlocutory appeal would eliminate the need for trial, simplify the need for trial, or

reduce the burden of discovery. *See David*, 37 F. Supp. 3d at 839. Instead, it seems an interlocutory appeal "would result in a delay of trial, regardless of outcome, because the appeals process itself would take longer than the time remaining before trial." *See Tesco Corp.*, 722 F. Supp. 2d at 768.

It is possible that granting an interlocutory appeal could prevent a post-trial appeal, as plaintiff suggests, but that possibility is not sufficient to find that an interlocutory appeal will materially advance the ultimate termination of the litigation when the instant case is scheduled for trial in just two weeks. *See id.* at 767-68. Additionally, plaintiff argues that "should the Fifth Circuit find the federal 6-year or a Louisiana 5-year time period to apply, liability for the FDCPA claim will be established with only damages to be decided." Rec. Doc. 44-1 at 6-7. However, in making this assertion, plaintiff does not acknowledge the class-related discovery and litigation that could result from a Fifth Circuit reversal, i.e., motion for class certification, discovery motions, etc. Consequently, as an interlocutory appeal does not materially advance the ultimate termination of the litigation, an appeal is not appropriate at this time.[6]

---

[6] Plaintiff also requests a stay of further proceedings pending interlocutory appeal. Rec. Doc. 44-1 at 7. As the Court finds an interlocutory appeal is not warranted here, then it need not reach a decision as to whether a stay of further proceedings is appropriate. However, in considering a stay, it is even more evident that an interlocutory appeal would not materially advance the termination of litigation here. The balance of equities does not weigh heavily in favor of granting a stay because plaintiff has not persuaded the Court that the public interest in eliminating abusive debt collection practices "outweighs

New Orleans, Louisiana this 10th day of March, 2022

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

the competing public interest in the expedient resolution of judicial controversies such that a stay of all proceedings is warranted." *Grant v. Houser*, 799 F. Supp. 2d 673, 680 (E.D. La. 2011). Because a stay of further proceedings is not appropriate here, an interlocutory appeal could result in a piecemeal appeal, which courts generally avoid, and which could prolong litigation. *See Ryan*, 444 F. Supp. 2d at 722 (quoting *Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 703 (5th Cir. 1961) ("[C]ertainty and dispatch in the completion of judicial business makes piecemeal appeal . . . undesirable[.]")); *see also Clark-Dietz*, 702 F.2d at 69 ("The basic rule of appellate jurisdiction restricts review to final judgments, avoiding the delay and extra effort of piecemeal appeals.").

17