UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CHARLES NAPOLEON** | **CIVIL ACTION** |
| **VERSUS** | **NO. 20-1775** |
| **SHOWS, CALI & WALSH, LLP, ET AL.** | **SECTION "B"(4)** |

## ORDER AND REASONS

Before the Court are plaintiff Charles Napoleon's motion for partial summary judgment (Rec. Doc. 46), defendants' opposition (Rec. Doc. 47), plaintiff's reply in support of his motion for summary judgment (Rec. Doc. 55), plaintiff's supplemental memorandum in support of his motion for partial summary judgment (Rec. Doc. 58), defendants' reply in opposition to plaintiff's motion for partial summary judgment (Rec. Doc. 61); and defendants' motion for summary judgment (Rec. Doc. 45), plaintiff's opposition (Rec. Doc. 49), and defendants' reply in support of their motion for summary judgment (Rec. Doc. 52).

For the reasons discussed below,

**IT IS ORDERED** that plaintiff's motion for partial summary judgment (Rec. Doc. 46) and defendants' motion for summary judgment (Rec. Doc. 45) are **DENIED**.

I.   **FACTS AND PROCEDURAL HISTORY**

This suit arises from a dispute over funds provided to Charles Napoleon following Hurricanes Katrina and Rita in 2005. Hurricane

1

Katrina made landfall in Louisiana and Mississippi on August 29, 2005, and was quickly followed by Hurricane Rita on September 24, 2005. Rec. Doc. 25 at 7. The resulting devastation was unprecedented, leading Congress to appropriate "disaster recovery funds to the State of Louisiana, through HUD's Community Development Block Grant ("CDBG") Program." *Id.* at 7-8. HUD directed Louisiana to submit an Action Plan for Disaster Recovery, and through this Action Plan the State "created the Road Home Program to compensate affected Louisiana homeowners for their losses." *Id.* at 8-9. CDBG grants funded the Road Home Program and the Louisiana Recovery Authority (LRA) operated it. *Id.* at 9, 9 n.10. The LRA is a "state agency created [by Executive order] to administer funds for recovery from Hurricanes Katrina and Rita, including CDBG Disaster Recovery Grant Funds." *Id.*

HUD maintained that they would "monitor the State's use of funds *and* its actions for consistency with the Action Plan." Rec. Doc. 31 at 4 (emphasis in original). Also, HUD would "instate risk analysis and on-site monitoring of grantee management of the grants and of the specific use of funds." *Id.* HUD's responsibility extended to "ensuring Louisiana's interpretation of the statutory and regulatory requirements were 'not plainly inconsistent with the [Housing and Community Development Act of 1974].'" Rec. Doc. 25 at 10 (alteration added) (quoting 24 C.F.R. § 570.480I). HUD's other responsibilities included: providing technical assistance,

"advice, training, or program models to ensure the State of Louisiana complied with CDBG program requirements . . . ." *Id.* The State of Louisiana remained responsible for "the implementation, design, and administration of the Road Home Program in conformance with the applicable CDBG Program requirements set by HUD." *Id.* at 11 (internal quotations omitted) (quoting Rec. Doc. 25-2 at 69).

Whereas the Road Home Program disbursed four types of grants, only two are involved in this matter: the compensation grant and the elevation grant. *See* Rec. Doc. 31 at 5. The compensation grant was given to homeowners to repair property damage on their homes. *Id.* Napoleon executed the compensation grant agreement on April 24, 2007, and received a check for $48,496.70 but "returned the check to the title company," thinking it was to purchase his house.[1] *Id.* at 7.

The elevation grant was "given to eligible homeowners who agreed to elevate their homes within three years." *Id.* at 5. The elevation grant totaled $30,000.00 and to receive the grant, the homeowner had to execute the Road Home Program Elevation Incentive Agreement For Use With Prior Road Home Grant. *See id.*; Rec. Doc. 25 at 11-12. Napoleon entered into the agreement on July 23, 2008. Rec. Doc. 25-2 at 51. The agreement provided:

> Within three years of the date of this Elevation Incentive Agreement, the elevation (height) of the home on the above Property will be at or above the Advisory

---

[1] Defendants dispute plaintiff's accounting of whether he received or returned his compensation grant. *See* Rec. Doc. 61 at 1-2; Rec. Doc. 47 at 1-3.

3

> Base Flood Elevation (ABFE's) published by FEMA . . . I understand that to comply with this paragraph I must elevate my home to be at or above the elevation required by this Agreement even if the authority having jurisdiction of building code enforcement is not requiring elevation of the home . . . If the home on the property does not meet or exceed the applicable ABFE's or BFE's by three years from the date of the Elevation Incentive Agreement, the entire amount of my Elevation Incentive must be repaid to the State of Louisiana . . . . This Agreement shall be enforceable, at law or in equity, by the State of Louisiana or the United States of America. I agree that [the Office of Community Development ("OCD")] shall be entitled to recover reasonable attorney's fees and other costs, in the event OCD institutes legal action against me for enforcement of this Agreement.

*Id.* at 50. "When Mr. Napoleon received the elevation grant, he used that money to repair his home." Rec. Doc. 31 at 7-8. Napoleon obtained a Certificate of Occupancy and Completion on October 12, 2011, which stated that he made repairs and renovated his home after the storms. *Id.* at 8. Napoleon did not keep copies of the original receipts or proof of repair. *Id.*

On July 26, 2013, HUD approved Action Plan Amendment No. 60 which stated:

> The cost to elevate homes has increased substantially since the Road Home program began disbursing Elevation Incentive (RHEI) awards to homeowners. In addition, many homeowners did not have adequate funds to complete the basic repairs needed to re-inhabit their homes at the pre-existing elevation. As a result, applicants receiving RHEI funds may have found it necessary to use those funds to complete their repair/reconstruction at the existing elevation. Since the primary goal of the Road Home Program is to enable applicants to return and reoccupy their homes, this Action Plan Amendment (APA 60) identifies how the use of RHEI funds will be considered in cases where applicants have used some or

4

> all of those funds to repair and re-occupy their homes. The purpose of APA 60 is to enable RHEI award amounts that have been used for home repair and reconstruction to be more accurately re-classified as part of the applicant's compensation award.

Rec. Doc. 31-12 at 2. This re-classification applied to "[o]nly Road Home applicants that have received an RHEI award and have not yet met the compliance terms associated with the award agreement . . . ." *Id.* The Amendment further stated that:

> If an eligible applicant . . . has used a portion or all of his or her RHEI funds for valid home repairs, then the respective amount used for home repairs will be added to the applicant's compensation award. Their RHEI award amount will be reduced accordingly. Homeowners must provide documentation that can demonstrate the use of the RHEI funds on valid home repairs.

*Id.* Two years later on December 28, 2015, the OCD sent Napoleon a letter stating that he could keep the elevation grant funds "[i]f you used your elevation incentive funds to finish the repairs to your home." Rec. Doc. 31 at 9, 51 (alteration in original) (internal quotations omitted).

On January 5, 2018, Mary Catherine Cali and John C. Walsh of Shows, Cali & Walsh, LLP mailed Napoleon a letter which stated that Napoleon "failed to establish compliance with [his] RHEI obligations." Rec. Doc. 25-2 at 53. The letter requested documents establishing that (1) the home was elevated; (2) the funds were used to elevate the home, but elevation was never completed; or (3) the funds were used to finish repairs to the home. *See id.* The letter also stated that:

5

> You have 30 days after your receipt of this letter to notify our office that you dispute the validity of this [RHEI], or any portion thereof. Failure to timely do so will result in an assumption by our office that the full amount of the RHEI repayment claim is valid.

*Id.* at 54. The letter further included that "if you do not take any of the actions outlined above, within ninety days after your receipt of this letter, Road Home may proceed with further action against you, including legal action, in connection with the amount of RHEI funds owed as outlined above." *Id.* At this point, Napoleon did not submit any additional documentation. Rec. Doc. 31 at 9. On February 12, 2018, Ashley Napoleon, plaintiff's current wife, called defendants saying Napoleon previously submitted documentation on how he used the elevation grant, but defendants could find no such documentation in their records. Rec. Doc. 31-13 at 2; Rec. Doc. 46-1 at 5. Then between June and July of 2019, Napoleon submitted additional photographs to show that he, as the applicant, shored his home. *See* Rec. Doc. 46-1 at 5; Rec. Doc. 46-11 at 1. Defendants, however, could not observe an increase in elevation. Rec. Doc. 31-13 at 1.

On July 1, 2019, Shows, Cali, & Walsh, LLP filed suit in the Orleans Civil District Court on behalf of the State of Louisiana, Division of Administration, Office of Community Development — Disaster Recovery Unit, naming Charles and Mary Ann Napoleon as defendants. Rec. Doc. 31 at 10; *see State of La., Div. of Admin., Off. of Cmty. Dev. — Disaster Recovery Unit v. Napoleon*, 2019-6927

6

(Orleans Parish Civ. Dist. Ct. 2019). In that suit, the State alleged Napoleon must return his $30,000.00 elevation grant. Rec. Doc. 31 at 10; *see* Rec. Doc. 31-4. On September 3, 2019, Napoleon answered, making no affirmative defenses. Rec. Doc. 25 at 13; Rec. Doc. 31 at 10. The State then moved for Summary Judgment, but on January 23, 2020, before the motion could be heard, Napoleon filed a voluntary Chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Louisiana (Case No. 20-10175). Rec. Doc. 31 at 10-11.

Napoleon next filed this suit against the law firm representing the Road Home Program on June 21, 2020, which defendants answered on October 30, 2020. Rec. Docs. 1, 11. The complaint was then amended on February 1, 2021. Rec. Doc. 19. In the amended complaint, plaintiff makes two claims for relief. Plaintiff's first claim is that under 15 U.S.C. §§ 1692e(2)(A), e(5), e(10), and f, defendants were prohibited from collecting the grant money from the plaintiff, because it was not owed to the State, as plaintiff used the funds within the acceptable parameters of the grant. *See* Rec. Doc. 19 at 11-13. Plaintiff also brought their second claim under 15 U.S.C. §§ 1692e(2)(A), e(5), e(10), and f, and contends that even if the money was owed to the State, defendants were time-barred from collection under the six-year federal statute of limitations, 28 U.S.C. § 2415(a-b), or in the alternative the five-year liberative prescription period for

7

actions on negotiable and nonnegotiable instruments under Louisiana Civil Code Article 3498. *Id.* at 13-15.[2] On July 16, 2016, defendants submitted a motion to dismiss for lack of standing/subject matter jurisdiction and for failure to state a claim. Rec. Doc. 35. Then on August 12, 2021, plaintiff filed a motion for class certification under Federal Rule of Civil Procedure 23. Rec. Doc. 28.

The Court denied defendants' motion to dismiss on plaintiff's first claim, but granted it on his second one. *See* Rec. Doc. 42. The Court found that even if plaintiff did owe the State money, collecting that debt was not time barred because the Louisiana ten-year prescriptive period under Louisiana Civil Code Article 3499 applies, not the six-year statute of limitations under § 2415(a-b) or the five-year peremptive period under Louisiana Civil Code 1564 or Louisiana Revised Statute 9:2771. *Id.* at 11-20. Accordingly, the Court also denied plaintiff's motion for class certification because plaintiff's class allegations were based on the claim that defendants' actions to collect Road home debt were barred by a six-year or five-year statute of limitations. *See* Rec. Doc. 43. Plaintiff filed a motion for certification of

---

[2] While plaintiff states in the Amended Complaint that the Louisiana Civil Code Article 3498 applies if state law applies, in plaintiff's response to defendants' motion to dismiss, he argues that if state law applies, the five-year liberative prescription periods of Article 1564 or Louisiana Revised Statute 9:2772 apply, not the liberative prescription period of Article 3498. *Compare* Rec. Doc. 19, *with* Rec. Doc. 31.

8

interlocutory appeal and a stay pending appeal. Rec. Doc. 44. Defendants then filed a motion for summary judgment on January 14, 2022 and plaintiff submitted a partial motion for summary judgment on January 18, 2022. Rec. Docs. 45, 46.

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). *See also TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). A genuine issue of material fact exists if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court should view all facts and evidence in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixson Bros. Inc.*, 453 F.3d 283, 285 (5th Cir. 2006). Mere conclusory allegations are insufficient to defeat summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

The movant must point to "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If and when the movant carries this burden, the non-movant must then go beyond the pleadings and present other evidence to establish a genuine issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). "This court will not assume in the absence of any proof that the nonmoving party could or would prove the necessary facts, and will grant summary judgment in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the [non-movant]." *McCarty v. Hillstone Rest. Grp.*, 864 F.3d 354, 358 (5th Cir. 2017).

### B. The Fair Debt Collection Practices Act (FDCPA)

The Fair Debt Collection Practices Act (FDCPA) was designed to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuse." *McMurray v. ProCollect,*

10

*Inc.*, 687 F.3d 665, 668 (5th Cir. 2012) (quoting 15 U.S.C. § 1692(e)). "A debt collector may not use any false, deceptive, or misleading representation or means in the collection of any debt," including falsely representing "the character, amount, or legal status of any debt," threatening "to take any action that cannot legally be taken or that is not intended to be taken," and using "false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. §§ 1692e(2)(A), (5), (10). Additionally, "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt," such as "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* § 1692(f)(1).

To state a claim under the FDCPA, the plaintiff must establish that: "(1) the plaintiff has been the object of collection activity arising from consumer debt, (2) the defendant attempting to collect the debt qualifies as a debt collector under the FDCPA; and (3) the defendant has engaged in a prohibited act or has failed to perform a requirement imposed by the FDCPA." *Sibley v. Firstcollect, Inc.*, 913 F. Supp. 469, 471 (M.D. La. 1995). When evaluating § 1692(e) or § 1692(f) violations, a court must view a debt collectors' practices "from the perspective of an

11

unsophisticated or least sophisticated consumer." *Daugherty v. Convergent Outsourcing, Inc.*, 836 F.3d 507, 511 (5th Cir. 2016) (quoting *McMurray*, 687 F.3d at 669). Accordingly, "we must assume that the plaintiff-debtor is neither shrewd nor experienced in dealing with creditors." *Goswami v. Am. Collections Enters., Inc.*, 377 F.3d 488, 495 (5th Cir. 2004). Nevertheless, "the unsophisticated consumer is not one tied to the very last rung on the [intelligence or] sophistication ladder." *Daugherty*, 836 F.3d at 511 (internal quotation marks omitted). Additionally, the FDCPA is construed broadly and in favor of the consumer. *Id.*

### C. §§ 1692e(2)(A), e(5), e(10), and f(1) Claims

The parties in the instant matter only dispute the third prong for establishing a FDCPA claim: whether defendants have engaged in an act prohibited by the FDCPA.[3] In plaintiff's partial motion for summary judgment, he asserts that defendants violated §§ 1692e(2)(A), e(5), e(10), and f(1) of the FDCPA because they attempted to collect a debt not owed. *See* Rec. Doc. 46-1 at 8. By attempting to collect plaintiff's elevation grant funds when not owed, plaintiff believes defendants falsely represented "the character, amount, or legal status of any debt," threatened "to take any action that cannot legally be taken, used "false,

---

[3] Defendants admit that they attempt to assist clients with collection of amounts owed. Rec. Doc. 11 at 2; *see also* 15. U.S.C. § 1692a(6). Moreover, plaintiff has been the object of collection activity arising from a consumer debt. *See* 15 U.S.C. § 1692a(3); *Calogero v. Shows, Cali & Walsh L.L.P.*, 970 F.3d 576, 585 (5th Cir. 2020).

12

deceptive, or misleading representation or means in the collection of [a] debt," and attempted to collect a debt not "authorized by the agreement creating the debt or permitted by law." *See id.; see also* 15 U.S.C. §§ 1692e(A)(2), e(5), e(10), and f(1). Plaintiff argues he did not owe the elevation grant funds because he used the funds in accordance with Action Plan Amendment No. 60, and previously provided proof of use for necessary home repairs consistent with same. *Id.* at 8-9. He asserts that in 2011 he obtained a Certificate of Occupancy and Completion stating that plaintiff renovated his home, including kitchen renovations, fixtures, flooring, sheetrocking, painting, electrical, and plumbing. *See* Rec. Doc. 49-1 at 3; Rec. Doc. 49-7. Then that same year, plaintiff contends he provided the state with "all original receipts and proof of repair." Rec. Doc. 49-1 at 3. Plaintiff, however, did not keep any copies of those receipts or proof of repair. *See* Rec. Doc. 55 at 6; *see also* Rec. Doc. 47 at 4. Plaintiff suggests that perhaps the OCD "misplaced the receipts and other proof of repairs." Rec. Doc. 55 at 3. Furthermore, to support his claim that he already provided proof of repair, and thus, the elevation grant funds were not owed, plaintiff also points to a June 2016 response to an OCD collection letter, which states he

13

sent receipts to OCD and used all the funds sent to him. Rec. Doc. 46-6 at 27.[4]

Defendants, on the other hand, claim that plaintiffs have not met its burden of proving that defendants' attempts to collect plaintiff's elevation grant funds violated the FDCPA. *See* Rec. Doc. 61. Defendants argue there is no evidence that plaintiff ever submitted proof of any home repairs. Rec. Doc. 47 at 3; Rec. Doc. 45-3 at 3-5; *see generally* Rec. Doc. 45-3. In an affidavit, Jeff Haley, the Chief Operating Officer of the OCD, lists every document in plaintiff's grant record, and none of these documents includes a submission of receipts for home repairs. Rec. Doc. 45-3 at 3-5. Additionally, defendants argue that the OCD's continued attempts to get plaintiff to provide them with proof of home repairs is consistent with the assertion that the OCD never received any proof

---

[4] Plaintiff also seems to imply that the $30,000 elevation grant had to be used for home repairs because plaintiff never used the $48,496.70 compensation grant, and he spent approximately $68,000 in repairs. *Id.* at 8-9. Plaintiff avers that he thought the $48,496.70 check he received from the State was actually from his mortgage company because he was a few months behind on his mortgage payments and receiving foreclosure letters. Rec. Doc. 55 at 4. Plaintiff thought the check was an offer to purchase his home. *Id.* Accordingly, he claims he sent the check back to the address on the foreclosure letters and never cashed the $48,496.70 compensation grant. *Id.* at 4-5. Moreover, when plaintiff deposed a First American Title Company (FATC) witness (the entity disbursing the grant funds) she admitted that FATC "has no documents showing Mr. Napoleon cashed the $48,426.70 compensation grant." Rec. Doc. 58 at 1-2. Thus, according to plaintiff, Mr. Napoleon relied on the $30,000 elevation grant to repair his home. *Id.* at 2. Defendants provided an affidavit from a FATC representative, which plaintiff claims is inadmissible, stating that "the Road Home Compensation Grant funds disbursed to Charles and Mary Napoleon, in the amount of $48,496.70, were not returned to the Program." Rec. Doc. 47-2 at 2. Throughout their briefing, defendants further question plaintiff's explanation of the $48,496.70 compensation grant. *See generally* Rec. Doc. 61; *see also* Rec. Doc. 47 at 2-3. The Court need not address any of these arguments as it finds other evidence demonstrates that a genuine issue of material fact remains.

of repairs, despite plaintiff's insistence that he sent them. Rec. Doc. 47 at 3; *see also* Rec. Doc. 45-3.

Although plaintiff's evidence in support of a FDCPA claim is limited, there does exist a genuine issue of material fact as to whether the debt that defendants attempted to collect was indeed owed, essentially based on whether or not plaintiff can carry his burden of proving that he sent defendants relevant home repair documentation. Accordingly, neither party is entitled to judgment as a matter of law on plaintiff's claims under 15 U.S.C. §§ 1692e(2)(A), e(5), e(10),[5] and f(1).[6]

New Orleans, Louisiana this 10th day of March, 2022

_____
SENIOR UNITED STATES DISTRICT JUDGE

---

[5] There is a question as to whether plaintiff's claims under § 1692e(10) are duplicative, as they are based on the same allegations as plaintiff's other claims under the FDCPA. *See Barlow v. Safety Nat. Cas. Corp.*, No. 3:11-cv-00236-BAJ-RLB, 2014 WL 1327922, at *5, (M.D. La. Mar. 31, 2014), *aff'd*, 586 F. App'x 191 (5th Cir. 2014); *Lee v. Credit Mgmt.*, 846 F. Supp. 2d 716, 724 (S.D. Tex. 2012). However, "there is no hardship to either party in allowing this disputed claim to proceed, especially as it is grounded in the same circumstances" as the other FDCPA violations. *See Ikonomidis v. Duggins L. Firm*, No. 13-5872, 2014 WL 3497246, at *3 (E.D. La. July 14, 2014).

[6] In defendants' reply brief in support of their motion for summary judgment, they note that in plaintiff's Chapter 13 bankruptcy filing he listed the Road Home grant as a debt. Rec. Doc. 52 at 5. They, thus, suggest that plaintiff treated the Road Home grant as an estate debt to be paid, and therefore, plaintiff should not be allowed to now take an "inconsistent position" that the Road Home grant is now one that is not owed. *Id.* In response, plaintiff claims that he does indeed dispute the debt in his Chapter 13 bankruptcy filing by noting the instant FDCPA lawsuit. Rec. Doc. 55 at 9-10. The Court agrees with plaintiff and need not further address defendants' argument.